The three defendants, John DeCamp, Harriet Deleplaine and C. W. North, as administrator, all file answers which are substantially the same; they deny all charges of fraud, bad faith and conspiracy, aver that John DeCamp was and now is sane; that the real estate was appraised at its true value; that the same was held and owned by Job and John DeCamp as partners; that the proceedings in the probate court were regular and lawful in all respects and that this court has no jurisdiction to set aside the decree of the probate court in this action.
The plaintiffs filed a reply, which is a general denial of all allegations of the answers not admitted in their amended petition.
*135 The first question we will discuss and dispose of is as to the jurisdiction of this court to inquire into and make a finding and decree relative to the proceedings in the probate court. It is claimed by the defendants that this court has no jurisdiction in the premises; if this be true, it is useless for us to pass upon the other questions involved in this controversy, because if jurisdiction is wanting all other matters fall with it.
The claim is based upon the proposition that a finding and decree of the probate court imports absolute verity and is binding on the whole world until it is reversed by a court of error, or modified or set aside on appeal; and it is further claimed that the judgment is not subject to collateral attack. This is unquestionably true where the probate court has acquired jurisdiction over all parties in interest and over the subject matter. In such a case the only remedy of the complaining party is to file a motion for a new trial, and if overruled save his exceptions and prosecute error, or appeal the case to the common pleas court and have the judgment modified or vacated.
It must be borne in mind in the beginning that the right of a surviving partner to have real estate declared partnership assets, and to take the same at the appraised value is purely statutory. The rights and duties of a surviving parner or partners are defined by Sections 3167, 3168, 3169 and 3170 of the Revised Statutes of Ohio. Fortunately for us these sections have received a construction by our own Supreme Court in the case of Rammelsberg et al v. Mitchell and Lape, 29 O. S., pp. 22-59. In this case not only the rights of the surviving partner have been passed upon, but the rights of those who claim under the deceased partner’s heirs as well. In that case, “The original action was brought in the Superior Court of Cincinnati by plaintiffs in error, who were the heirs and devisees of Frederick Rammelsberg, deceased, against the defendants in error, who were the executors and trustees under the will of Frederick Rammelsberg. deceased. The original petition charged the defendants with divers acts of mal-administration, and prayed that certain judgments and conveyances, therein-after described, might be set aside; that the trusts might be executed, an account taken, and for other relief.”
Judge Mcllvaine, in speaking for the court relative to the *136 question when real estate becomes partnership assets under the statute, has this to say:
“Can partnership real estate be transferred to a surviving partner as assets of the firm, under this statute? In so far as the proceedings authorized by the act are adversary in character, it is the personal representative, and not the heir of the deceased partner who stands in the relation of adverse party to the surviving partner. From this fact it may be fairly assumed that the assets thus transferable are such only as are by law subject to the administration and control of the personal representative. and do not include those of which the beneficial interest descends to the heirs. The foundation question, therefore, would seem to be: Under what conditions and circumstances, if any, does real estate become personal assets, to all intents, in the hands of a co-partnership?
“It must be conceded that a co-partnership is incapable of taking or holding the legal title to real estate, yet it is equally certain that it may acquire an equitable estate therein. It is well settled that whenever real estate is purchased with partnership funds, an equitable estate accrues to the partnership, whether the legal title be conveyed to the partners as individuals, or to either of them, or to a stranger; and in such case, upon the death of the person holding the legal title, it descends to his heir at law in trust for the benefit of the partnership — at least to the extent that it may be needed to satisfy demands against the partnership, whether such demands exist in favor of a stranger or a member of the co-partnership. This doctrine is quite familiar, as is also the doctrine that in such case the realty is regarded and treated as personal property in the hands of the partnership to the extent it may be needed for partnership liabilities.
“And we go a step further. There is no doubt that if, by the terms of the partnership articles, real estate be purchased with partnership funds, or be put otherwise into the partnership stock, to be used and held solely for partnership purposes, it is to be regarded as converted out and out into personalty, so that the heir at law takes no beneficial interest therein in any event, but the proceeds not needed for partnership purposes pass to the personal representatives of the co-partners.
“A question, however, is made, and' concerning which some doubt arises from the conflict in decided cases. Will anything short of an express covenant in the partnership articles have the effect in equity of converting realty into personalty to all intents ?
“We see no good reason for holding that an agreement in writing is necessary for such conversion. Undoubtedly the in *137 tention to convert out and out should be made to appear clearly; but such intention may be inferred from circumstances with sufficient clearness. While, therefore, we think that the mere fact that real estate has been bought with partnership means is not sufficient to impress upon it the character of personalty for all purposes, even though the rents and profits thereof may have gone into the partnership business, still we are of opinion that such conversion .is sufficiently shown where real estate is purchased for partnership purposes, paid for with partnership means, and used solely for the conducting of the partnership business. The line of demarcation between an absolute conversion and a conversón sub modo, is this: In the former it must be needed and actually used in the partnership business; in the latter it is enough that it was purchased with partnership means.
“We conclude, therefore, that the equitable title to partnership real estate which has been appropriated and exclusively devoted to the partnership business, may be transferred to the surviving partner by proceedings in the probate court, had in pursuance of this statute. On the other hand, such proceedings are ineffectual to transfer any interest in real estate not so devoted. Real estate of the latter description not being assets of the firm within the meaning of the act, such proceedings in relation thereto are void for want of jurisdiction over the subject-matter, and the equities of the heir, who is not a party to the proceedings, are in no wise affected. In the case before us, this class of property remained in the hands of the trustees, subject to the same trust after the proceedings in the probate court as before them.
“Upon the whole case, we think the judgments below should be reversed and the cause remanded for a new trial as to all matters and issues in relation to the good will of the firm, and also as to those parcels of the real estate of the firm, which, under the rules herein stated, did not pass to Mitchell under the proceedings in the probate court.”
Judge White, in concurring in the judgment, said, page 58:
“I also agree that the plaintiffs, under the circumstances of the case, are not concluded by the decree which undertakes to invest the surviving partner with a title to the real estate, of which the probate court had no jurisdiction. The object of the suit in which the decree was rendered was to clothe the surviving partner with the legal title to the property, the equitable title to which he had already acquired by virtue of the proceedings in the probate court. His right to the property was based exclusively on that proceeding, no other claim or title being *138 asserted for adjudication. In so far, therefore, as the probate court had. no jurisdiction or authority under the statute to transfer the real estate of the plaintiffs, I think the decree of the superior court may be impeached, as well by the adult plaintiff as by the minors, toward all of whom the defendant stood in the relation of trustee.”
Here the judgment of the probate court was impeached for want of jurisdiction over the subject-matter, in a direct proceeding for that purpose in the Superior Court of Cincinnati, which court has concurrent jurisdiction with our common pleas, except in divorce and criminal matters.
“It is by no. means intended to question or impair the principle that when jurisdiction has been obtained over the subject-matter of a cause, by a court competent to exercise it, its judgment, however erroneous, can not be questioned in a collateral proceeding. A judgment so rendered can only be set aside or questioned in a direct proceeding instituted for that purpose. This is familiar law.” Spoors v. Coen, 44 O. S., p. 502; Freeman on Judgments, Section 135; Saxton v. Seiberling, 48 O. S., p. 554.
It has even been held in this state that a judgment of the probate court may be attacked collaterally under certain circumstances. See Spoors v. Coen, supra.
The action in the case before us is a direct attack on the judgment rendered in the probate court, and it seems clear to us, both upon reason and authority, that such an action is authorized. The proceedings under the statute in question in the probate court are adversary in character and the statute clearly indicates who the parties shall be. The surviving partner is the plaintiff or complainant and the administrator of the deceased partner is the defendant. It is the personal representative of the deceased partner who stands in the relation of adverse party to the surviving partner, and not his heirs. This being true, why should the heirs of the deceased partner be bound by the proceedings in the probate court where fraud, want of jurisdiction and insanity of the surviving partner are involved in the judgment? Neither Catharine Jones, Delaplaine DeCamp, nor Harriet Delaplaine were, or could have been made parties in the probate court, either at the instance of John DeCamp, or upon their own motion, because the proceedings are *139 statutory, and no provision is made in the statute for notice to the heirs of the deceased partner; no provision is made for filing .answers, and no provision is made for a hearing by them in .any stage of the proceedings. Not being proper parties, how could they save their rights on motion for a new trial, error •or appeal? Can it be said that a party can be divested of his property rights without his day in court? To answer this ■question in the affirmative would be nothing short of confiscation. If the proceedings in the probate court are lawful and regular in all respects, the heir of the deceased partner should be forever foreclosed from interfering with the same. If they .are not, and his property rights have been invaded unlawfully, he has, and ought to have a remedy by a direct action in another ■court of competent jurisdiction to impeach the unlawful judgment. Such is equity and such is the spirt of the statute. Any other conclusion would open wide the doors to fraud and the administration of justice would be a mockery in its broadest .sense.
We come now to the next question for our solution, namely: Were the nine pieces of real estate, which were ordered to be ■conveyed to John DeCamp by the probate court of this county, -partnership assets within the intent and meaning of the statute ?
In order to arrive at á correct conclusion in this regard we must apply the evidence in the case to the law as we find it. The law determining when real estate is converted into personal property and therefore becoming partnership assets is well settled at least in this state. The field is a wide one, and the .ground has been thoroughly covered by eminent jurists and text-writers, but, after all, there are a few fundamental principles •upon which they all agree which are decisive of the point. We will mention a few of them, enough to cover the ease in hand.
1st- All authorities agree, in the absence .of written articles of co-partnership, that real estate can never become personal property or firm assets, unless the same was purchased with partnership funds.
2d. There must, in the first instance, be a conversion, but an agreement in writing is not necessary to show that fact. Ram-melsberg et al v. Mitchell and Lape, 29 O. S., 53.
*140 3d. “The mere fact that real estate has been purchased with partnership means is not sufficient to impress upon it the character of personalty for all purposes, even though the rents and profits thereof may have gone into the partnership business.” 29 O. S., 53, supra.
4th. “But such conversion is sufficiently shown where real estate is purchased for partnership purposes, paid for with partnership means, and used solely for the conducting of the partnership business.” 29 O. S., 53, supra.
5th. “Land purchased with partnership funds, and occupied and used by the firm in conducting its business, is in equity partnership property, although the conveyance is made to the individual members of the firm.” Norwalk National Bank v. Sawyer, 38 O. S., 339; Page v. Thomas, 43 O. S., 38; Bank v. Miller, 153 Ills., 244.
6th. “The mere use of land by a firm in the firm business does not make such land partnership property.” Bank v. Miller, 153 Ills., 244.
7th. “Where the intention to convert land into firm property is inferred from circumstances, these must be such as do not admit of any other equally reasonable explanation, and if an agreement is relied upon to that end, the same must be clear and explicit.” Bank v. Miller, 153 Ills., 244 ; 29 O. S., supra.
8th. “The fact that three persons, owning undivided individual interests in a tract of land, form a partnership and use the land in the firm business, will not, in the absence of any explicit agreement or of controlling circumstances, render such land firm assets.” Bank v. Miller, 153 Ill., 244; Goepper v. Ginsinger, 39 O. S., 429.
9th. Evidence of conversion of real estate into partnership assets of personal property.
“The fact that real property is held in the joint names of several owners is no evidence of co-partnership between them with respect to it. In the absence of proof of its purchase with partnership funds for partnership purposes, such property is deemed to be held by them as joint tenants, or as tenants in common.” Thompson et al v. Bowman, 6 Wallace (U. S.), 316.
10th. “If land be conveyed to partners, in fact as partnership property, bat in form to them as tenants in common, and *141 one dies, his heir becomes tenant in common with the other partner or partners.” Parsons on Partnership, 3d Ed., p. 405, Sec. 374; Parsons on Partnership, 4th Ed., Sec.‘266.
11th. “The mere purchase of lands with partnership money, and their use for the purpose of carrying on the partnership business of farming, furnishes no sufficient evidence of an intention on the part of the partners to convert the land into personalty.” Lowe v. Lowe, 13 Bush. (Ky.), 688.
12th. “On an issue of partnership the declarations of one of the alleged partners, made in the absence of the others, can not, as against the one absent, be used to establish the controverted fact of partnership. This rule of evidence seems to be well established.” Cowan v. Kinney, 33 O. S., 422-428, and other cases cited therein; Harrison v. Neely, 41 O. S., 334.
We have cited sufficient well established principles with the authorities supporting them for the purposes of this case. Many more might be referred to bearing upon the questions involved, but to do so would be neither profitable nor interesting, and would extend this opinion beyond its legitimate scope.
Applying, then, the evidence before us to the legal requirements which must be met, how does the case stand?
Nearly one hundred witnesses were called' and examined, to say nothing about the record evidence introduced, and it would be a useless and unnecessary task to discuss all the evidence in detail. We will therefore content ourselves in the main by giving our conclusions. The evidence shows the existence of the following facts:
That William DeCamp, Sr., died on the 21st day of January, 1849, on his homestead south of Fort Jefferson, Darke county, Ohio, leaving a widow, Isabel, and seven children, Job, Catharine, John, Jane, Deleplaine, William and Harriet surviving. William died seized in fee simple of the homestead farm consisting of 160 acres of land located in Sections 27 and 34; also of about 167 acres of land located in Sections 28 and 33; known in this action as the “Big Woods Farm.” A few days before he died he made a will and deeded his undivided one-half interest to his son Job, in what is known as the Berry Farm.
In 1847 Job bought in his own name 80 acres of land and John bought in his own name 40 acres of land in Darke county, *142 Ohio. On April 8th, 1849, one Adam Bellas died seized in fee simple of what is known herein as the “Bellas Farm,” save 20 acres in the northwest corner, which belonged to one Jacob Roberts. In the same year Job and John each traded his ' respective tract of land to some of the heirs of Adam Bellas.
About the year 1850, through proceedings in partition and deed of conveyance, Job and John DeCamp became the owners of the residue of the interests of the Bellas heirs (except the 20 acres belonging to Jacob Roberts.) In the year 1850, Isabel, the widow of William, Sr., with the children, Job, John, William, Deleplaine and Harriet, moved from the homestead to the Bellas farm, where they all lived together until the year 1861, at which time all but Deleplaine moved to Ft. Jefferson. In August, 1857, one Jacob Roberts owed the widow, Isabel, the sum of $650 for rent, for the use and occupation of her 80-acre tract in the homestead which was set off to her as her dower interest in her husband’s land; Roberts could not pay her, so she purchased his 20-acre tract in the northwest corner of the Bellas farm and canceled his debt to her, but the deed was put in the name of Job and John DeCamp. The deed shows a consideration of $800. The testimony shows that the widow paid $650 of it. While the widow and her five children were living on the Bellas farm, from 1850 to 1861, they all farmed the land- together; no cattle were kept on the Bellas farm during that period of eleven years save eight milk cows, which belonged to the widow. Deleplaine remained on the Bellas farm after the widow and her four children moved to Fort Jefferson in 1861; from that time until 1867, Deleplaine farmed the Bellas farm himself, or the greater part of it. Job worked at the carpenter trade from 1847 to 1852. John and one Philips farmed the home place for two or three years from 1847. In 1851 or ’2, Job and John were in the threshing business, and continued in that business for four or five years. In 1853 or ’4, Job and John bought some cattle together. Job had bought some cattle prior to that time on his own account and pastured them on his own land, the Berry farm. The widow Isabel died in 1863. From 1850 to 1885 Job owned one-fourth interest in the “Big Woods” tract and the 19-acre tract. Deleplaine, Harriet and William each owned one-fourth. William, *143 Jr., died in 1884 or ’5. The testimony shows that these lands were used by Job and John for about thirty years for cattle pasture until William died, but fails to show that either Job or John ever paid any rent for the same to any one. In 1885 Deleplaine DeCamp sold all his interests in the" two tracts of land and his interests in the two-fortieth’s in the old homestead to Job and John DeCamp for $2,750. In 1887 Harriet Deleplaine sold her interest in the same four tracts, to Job and John for $3,075. Catharine Jones made a deed of gift in 1885 of all her interests in these tracts of land to Job and John.
We have made the following computation, which we believe to be correct, to-wit:
John inherited from his father 1-4 of the 148 acres in section 28 and 19.88 acres in section 33, or he inherited 42 acres in both. Job and John each inherited 1-20 of both these tracts from William, making 8 1-3 acres each, and Catharine Jones gave them her share in each, or 8 1-3 acres, or they secured by inheritance from William and deed of gift from Catharine, 25 acres in these two tracts, or they secured 42 acres plus 25 acres; total, 67 acres in these two tracts without the payment of a single cent. They each inherited 1-6 of the two-fortieths in the old home farm, amounting to 26 2-3 acres. They inherited from William in the same two tracts 1-30 each, or 2 2-3 acres each, or 5 1-3 acres for both. They secured by deed of gift from Catharine Jones the 1-6 she inherited from her father in the twoforteith’s, or 13 1-3 acres, and they also secured from Catharine the 1-30 of both tracts which she inherited from William, or 2 2-3 acres, making a total they inherited or secured by deed of gift in the two-fortieth’s of the old home farm of 48 acres. This number of acres added to the 67 acres which they inherited and secured by deed of gift in the Big Woods tract of 148 acres, and the 19.88 acres in section 33, makes a total of 115 acres which Job and John secured in these four tracts by inheritance and deed of gift from Catharine without any cost whatever to them.
Job and Deleplaine bought the 7-aere tract and 3.53 tract with equal interests. Deleplaine afterwards sold to Job and John. This gave Job 3-4 and John 1-4 interest in these two tracts. Job tried to buy the Bowers farm of 26 acres on his *144 own account. He cautioned Schuyler Yiets, who had it for sale, to say nothing about it to John. John found it out, however, and spoiled the sale to Job. The land was afterwards conveyed to Job and John. That Job and John bought and sold cattle together is manifest. That the cattle bought by Job and John were pastured on the land held by them in their individual names, as well as upon the land that belonged to Job individually and the land that John owned individually is clear. That the land was not pastured to more than one-half its capacity can not be questioned. That some of the land was rented at times on the shares for farming purposes and at other times for money rent is admitted. The personal property of each, the products of the land and the proceeds from the sale of their cattle was listed separately for taxation. The difference between the amount of cash money returned by Job and that returned by John amounts to nearly $10,000 from 1881 to 1901. Eleven years during this period John returned no cash money. Job returned cash money every year save one.
Joshua Deleplaine was in business with Job and John some twenty years ago for a period of two or three years. He testifies that when they bought cattle together, each paid his one-third, and that when the cattle were sold the money was divided into three equal parts; one-third belonged to Job, one-third belonged to John, and one-third belonged to Joshua. Deleplaine De Camp, who was familiar with the business transactions of Job and John up to 1867, tells us that they always divided their money when the cattle or products of the farm were sold.
The entire evidence adduced in the case fails to show the existence of partnership articles. No partnership name was ever used. No partnership books were ever kept. No written partnership contracts were ever executed. No partnership bank book was ever taken out and no partnership money was ever deposited in bank as such. The money was always deposited in the individual name of each and individual certificates of deposit were issued. Therefore, if there ever was a partnership existing between Job and John DeCamp it arises by way of inference only.
Job DeCamp is physically dead and John DeCamp is civilly dead to the world so far as the issues in this case are concerned. *145 Job can not tell ns anything about the alleged partnership and John won’t if he could. John’s age and former life can not shield him from merited criticism, if he is sane; if he is insane, he is entitled to the sympathy of all and should be judged accordingly.
John DeCamp’s actions and conduct from 1900 until the close of the trial of this ease are a legitimate subject of inquiry in arriving at a truthful finding and correct judgment in this case. It offers a fruitful field for investigation and deserves more than a passing notice. From the record evidence before us we find that Harriet Deleplaine, one of the defendants in this case and a sister of Job and John DeCamp, commenced a partition suit in the Common Pleas Court of Darke County, Ohio, on the very day Job DeCamp died (August 16, 1901). In her petition she avers that she is seized in fee simple of an undivided one-fourth interest as heir of Job DeCamp, deceased, in the land which was subsequently conveyed to John DeCamp under the probate court proceedings, being the same land involved in this controversy. She also avers that the defendants, Catharine Jones, John DeCamp and Deleplaine DeCamp are also tenants in common with her in said premises, and are each entitled to a one-fourth interest therein as heirs of Job De Camp, deceased. She prays for partition in severalty or a sale of the land.
On September'21st, 1901, John DeCamp filed his answer and cross-petition to said petition of Harriet Deleplaine, in which he makes the following averment:
“Comes now the defendant, John DeCamp, one of the defendants herein, and for his answer to plaintiff’s amended petition admits that the plaintiff has a legal right to and is seized in fee simple, as an heir at law of Job DeCamp, deceased, of the undivided interests in the various tracts and parcels of real estate described in the amended petition as therein set forth.
“This defendant admits that the plaintiff and the defendants described in said amended petition are tenants in common as set forth in said amended petition, and that they are seized in fee simple of the interests of the real estate therein described, with the exception of those tracts herein excepted and above set forth, and says that the interests of the plaintiff and the defendants in the tracts herein set forth and described should *146 be apportioned as herein described, and he asks that the interest of the plaintiff and the defendants in said premises may be partitioned as prayed for in said amended petition, except he asks that the interest as between plaintiff and the defendants of the lands excepted and described in his answer herein may be partitioned among the plaintiff and the defendants in the proportions herein set forth, and that he may have any and all relief to which he is entitled in the premises.”
On October 21, 1901, the sanity of John DeCamp was.challenged in the partition proceedings by Deleplaine DeCamp.
On December 2, 1901, before any action was taken by the court of common pleas in the partition proceedings, and before the sanity of John DeCamp was passed upon, he filed an application in the Probate Court of Darke County, Ohio, alleging that he was the surviving partner of Job DeCamp, deceased, and that all of the real estate involved in this case was owned and held by him and said Job, in partnership. Such proceedings were had on said application that on the 10th day of December, 1901, said probate court found that said John and Job held and owned said lands in partnership, and ordered said administrator of Job to convey all of Job’s interest in said lands to John by deeds in fee simple.
On December 12, 1901, the plaintiffs commenced this action to vacate the said proceedings in the probate court. On December 28, 1901, plaintiffs filed a motion in this case asking the court to appoint three medical experts to inquire into the mental condition of John DeCamp. On January 6, 1902, Judge Brown appointed three medical experts to inquire into the alleged insanity of John DeCamp and report their finding to the court.
• On January 9, 1902, the medical experts attempted to execute the order of the court, but failed, for the reason that John DeCamp had either left on his own account, or had been spirited away by friends and relatives on the previous Sunday to Somerset', Ind., at which place he has ever since made his residence and home with Mrs. Dr. Rodgers, a niece of his and the daughter of Harriet Deleplaine. Early on Saturday morning, January 4, 1902, John DeCamp’s mental condition was inquired into by Doctors Markworth and Rush, who were employed by counsel for the defendants. The physicians pronounced him sane, and immediately thereafter he made his will, leaving all of his *147 property, real and personal, to Minnie Deleplaine, a niece, who is the daughter of Harriet and Joshua and the sister of Mrs. Dr. Rodgers. The same morning an attempt was made by him to go to Somerset, Ind.; the train was missed and the journey was deferred until the next morning. Between January and April, 1902, several attempts were made by the plaintiffs to take the deposition of John DeCamp at Somerset, Ind., but they .were unavailing. Peremptory orders were issued by Mrs. Rodgers, Mrs. Delaplaine and others in charge of John, that he should not be seen or talked to by the attorneys of plaintiffs, or others who desired to see him in their behalf, notably Dr. King of Dayton, who went to Somerset for the express purpose of examining into his mental condition.
On May 17, 1902, this case was regularly assigned for trial in Greenville. At that time part of a deposition of John DeCamp ’s was stricken from the files by the court, and thereupon counsel for John made an application for a continuance of the case, which was granted, in order that the testimony might be procured either in person or by deposition. The case was tried without either, although Dr. Hauser, his own physician at Somerset, testified that the health of John was such that either course might have been pursued.
And we further find that on the 29th day of April, 1902, John DeCamp procured a temporary injunction against Catharine Jones, Deleplaine DeCamp and C. W. North as administrator of Job DeCamp, restraining them from taking his deposition until his health was restored.
This is a brief summary of the conduct of John DeCamp since the death of his brother Job on August 16, 1901. Upon this and other evidence in the case, we are called upon to determine two facts—
1st. Did the probate court have jurisdiction over the subject-matter of the proceedings before it?
2d. Did John DeCamp at the time have mental capacity sufficient to know and understand the nature and effect of his business transactions?
In determining question No. 1, we can not overlook the fact that this alleged partnership arises, if at all, by implication. It is the law that gives it force and life, if any it has, and not *148 the partnership articles or contract between the parties; because there were none. Neither will the use of the land alone for partnership purposes be sufficient to create a partnership by implication. This is well settled in Ohio, by the eases cited herein.
We have reviewed all the testimony in this case and fail to find any evidence even tending to show that any of this land was purchased with partnership funds, or that any partnership funds were ever in existence. All of the testimony shows that when the cattle or products of the land were sold, the money was divided between Job and John, and either deposited by them in their individual names in bank or kept by them on their persons. Again, the potent fact exists that the very moment the money was divided between Job and John DeCamp it ceased to be partnership funds and became the personal and individual property of each. This, we think, can not be gainsaid. We find no authority cited in this case holding in the absence of co-partnership articles, that there can be such a thing as partnership in lands, or that the lands can be considered as partnership assets upon the death of a member of the firm, unless in the first instance they were purchased with partnership funds. Job and John may have been partners in the cattle business but that fact of itself does not answer the requirements of the law, as' will readily be observed upon an examination of the authorities.
And, finally, the deeds to all of this land conveying the legal title to Job and John show upon their face that they took and held it as tenants in common, and in the absence of anything in the deeds to the contrary, such would be the legal presump-, tion.
Entertaining then these views we are clearly of the opinion that Job and John DeCamp owned and held all these parcels of lands as tenants in common and not as partners. Therefore the land did not become partnership assets upon the death of Job, under the statute, and the proceedings in the probate court were ineffectual to transfer any interest Job had in them to John DeCamp, and such proceedings are void for want of jurisdiction over the subject-matter.
Was John DeCamp sane or insane during the years 1901 and 1902 ? No claim is made that he was insane in the broadest and *149 fullest sense of the term, as I understand it, but the claim is made that during this period, especially during the summer of the year 1901, and up to the present time he did not have mental or legal capacity sufficient to transact the ordinary business affairs of life. The evidence in the case forces us to that conclusion. Upon no other reasonable hypothesis can his actions and conduct be explained. Here we have a man 80 years of age, unmarried, out of debt, owning and holding valuable land, amounting to about 300 acres, of frugal habits, with no one depending upon him for support, under a personal expense of not more than $200 per .year, admittedly weak in body and mind, to the .extent, at least, that he was no longer physically able to farm or raise stock himself, or to superintend the work of others that might be done for him, buying a farm aggregating about 300 acres without money enough of his own even to make the cash payment, involving himself in debt to the extent of nine or ten thousand dollars to meet future payments in the short time of nine months, and with no earthly show of ever being able to pay it back by work and labor of any character known to good husbandry. To tell me that he fully understood and appreciated such a task would be arguing an absurdity. Even a younger and more successful business man than the record shows John DeCamp ever to have been would have hesitated long and seriously before ever encountering such a risk. Add to this the fact that he has allowed himself to be made a prisoner in time of peace. Add to this the fact that he is an exile in a strange land among strange people, comparatively speaking. Add to this the fact that no word of inquiry comes from his lips about his former home and lifelong friends, and the fact that no friendly message is sent by him to his aged brother and blind sister. Add to all these the fact that in the month of September, 1901, he solemnly affirmed in his answer and cross-petition in the partition suit, that these lands were held by him as tenant in common and that Deleplaine, Catharine and Harriet were tenants in common with him in said land and each entitled to the undivided one-fourth thereof, and that in the month of December, 1901, he solemnly swore in his application in the probate court, that the same lands belonged to him as surviving partner of Job DeCamp, deceased. And, finally, take into consideration the fact *150 that this great law suit of which he had personal notice, involving one-half of his earthly possessions, amounting to thousands of dollars, has been instituted, tried and disposed of in his absence, with no personal effort on his part to avoid its disastrous results, and with no information from him personally given to the court, upon which it might base a decree in his favor. Can it be seriously contended in the face of all these indisputable facts that John DeCamp has been sane since the death of his brother Job? No. Since that time he has been but clay in the potter’s hand ready to be moulded into any convenient image.
But, suppose we are mistaken in this conclusion, and that John DeCamp is and was sane after Job’s death, how does he stand before this court? We have a principle of law in force in this state, announced by the distinguished Thurman, which is peculiarly applicable to John DeCamp in this case if he was sane. In commenting on the testimony of the defendant Ryan in that ease, who claimed title under one Shannon, where' Shannon had conveyed a prior title to the same premises to his daughter and had the deed recorded, Judge Thurman said:
“He was called as a witness and testified. When he did so, he had the strongest motives to state that he did not mean, by the execution and recording of the deed, to part with his title. For he had subsequently conveyed the land to Ryan with warranty, and if he made that conveyance willfully and corruptly, knowing that he had no title, he committed no less than a penitentiary offense. Yet he uttered not one word to explain the intention with which he sent the deed to the recorder.
“Nor did the defendant venture, so far as appears, to put a question to him touching his intent. Why this silence of both witness and party? Why this failure to prove what the interest of both required to be proved? Why this neglect to make a successful defense ? It seems to us there is but one answer we are authorized to give to these questions, and that is, that the question was not asked, because the answer would have been unfavorable, and, for the same reason, there was no unasked statement by the witness. This is the ordinary presumption where a party fails to offer proof of what he ought to prove, if it exist. It is almost incredible that, in the case before us, the defendant would fail to ask, and the witness to state, whether it was the intention to convey the land, if that *151 intention had not in fact existed. The very object for which the witness was called was to prove that the deed was never delivered, bnt instead of asking him directly for what purpose he caused it to be recorded, the defendant contents himself with proving circumstances, from which he asks the court to infer the purpose.” Lessee of Mitchell v. Ryan, 3 O. S., p. 384-5-6.
This after all is but common sense moulded into a legal presumption by a great judge. Carrying this legal presumption with us and applying it to John DeCamp, sane, may we not well inquire: Why this silence of John DeCamp? Why this failure to prove what the interest of John DeCamp required "to be proved, known only to him? Why this neglect to make a successful defense? Why did not John DeCamp come back to Ohio, take the witness stand and prove the partnership between Job and himself? Why did not John DeCamp come back to Ohio, and satisfy judge and neighbor that he was not an imbecile? Why did not John DeCamp have his deposition taken if he was physically unable to attend court?
It seems to us there is but one answer we are authorized to give to these questions, and that is, that John DeCamp was not examined as to this alleged partnership, because his answers would have been unfavorable, and for the further reason that his testimony in any form would have disclosed his insanity.
Having already found that John DeCamp was an imbecile, this presumption can not prevail against him, but it is alluded to by the court only in answer to the claim made by counsel for the defendants that John DeCamp was sane in 1901-2, and in answer to the claim made by some of the witnesses in this ease supporting that theory.
We will leave this land where Job DeCamp left it when he died, and those to whom John DeCamp said it belonged when he filed his answer and cross-petition in the partition suit.
We will not attempt to discuss and make a finding on the other two points raised in this case, namely, the value of the land, and the charge of actual fraud. Neither is it necessary, because fraud actual or constructive when proven is equally destructive to the rights of the parties affected.
We therefore conclude:
Anderson & Bowman, Robeson <& Yount, Devor & Devor, for plaintiffs.
W. Y. Stubbs, A. A. North, J. D. Conner, C. H. Kumler and C. M. Brumbaugh, for defendants.
1st. That this court has jurisdiction to inquire into and vacate the proceedings in the probate court, finding that the land in question was partnership assets.
2d. That the probate court had no jurisdiction over the subject-matter of the proceedings.
3d. That the parcels of land involved, were held and owned by Job and John DeCamp as tenants in common and not as partners.
4th. That John DeCamp was an imbecile to the extent that he did not possess mental capacity sufficient to make an application in the probate court, or to declare his intention to elect to take the land.
5th. That the conduct of John DeCamp in instituting the proceedings in the probate court and causing deeds of conveyance to be executed to him for Job’s interest in the parcels of land held by them as tenants in common, operated as a constructive fraud on the legal rights of the plaintiffs in this case.
An order therefore may be taken by the plaintiffs, declaring null and void the proceedings in the probate court, because said court had no jurisdiction over the subject-matter of the suit; also, cancelling all the deeds of conveyance from C. W. North as administrator of Job DeCamp, to John DeCamp under said proceedings; also quieting plaintiff’s title in said lands and a decree for their costs expended.
The common pleas court was sustained by the Circuit Court of Darke County on June 26, 1903, as follows:
Jones et al v. DeCamp et al.
Sullivan, J.; Wilson, J., and Summers, J., concur.
The motions to strike out the deposition of A. B. Houser and also the depositions of the several witnesses taken before W. S. Rothehamel, notary public, are sustained.
We think the evidence in this case clearly and conclusively established the fact that the nine pieces of real estate involved *153 were not partnership property and never treated and considered as such by the decedents Job DeCamp and John DeCamp, and at the time the proceedings were taken in the probate court by John DeCamp, he was mentally incapable of understanding the character and nature of the proceeding or what under the law constituted partnership property. It follows therefore that the probate court was without jurisdiction and its judgment therefore void.
In view of the able and elaborate opinion of Judge Kumler (that has been preserved) upon both the law and facts and that it is in every respect the view of this court, the opinion of this court if written out in detail would be simply a repetition — we would not add to or take from it. Therefore the same decree may be entered here as in the common pleas, saving exceptions for the defendants. If attorneys agree upon entry the same may be placed upon the record without the court’s approval.